UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESILIENT FLOOR COVERING PENSION FUND, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TD SPORTS GROUP, LLC,<br><br>Defendant. | Case No. 22-cv-04649-HSG<br><br>**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1] |

Plaintiffs Resilient Floor Covering Pension Fund and Board of Trustees of the Resilient Floor Covering Pension Fund (collectively "Plaintiffs") brought this action on behalf of themselves and plan participants and beneficiaries against Defendant TD Sports Group, LLC ("TD Sports") under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et. seq ("ERISA"). *See* Dkt. No. 1 ("Compl.") ¶ 1. Plaintiffs' complaint seeks to collect the withdrawal liability that the pension fund assessed against Field Turf Construction, Inc. ("FTC"), arguing that Defendant is the successor of FTC and therefore jointly and severally liable for the withdrawal liability assessed against FTC. *See id.* at ¶¶ 30–41.

The matter was tried to the Court, sitting without a jury, in January 2024. On February 26, 2024, the parties filed proposed findings of fact and conclusions of law. *See* Dkt. Nos. 89, 90. The Court heard closing arguments on March 15, 2024. *See* Dkt. No. 91. The Court has carefully considered the evidence presented at trial, the exhibits admitted into evidence, the parties' proposed findings of fact and conclusions of law, and the arguments of counsel. The following constitutes the Court's Findings of Fact and Conclusions of Law. *See* Fed. R. Civ. P. 52(a).

---

[1] The Court files this amendment to modify one citation at page 15 of the Court's prior findings, Dkt. No. 92. The rest of the findings remain unchanged.

**I.   INTRODUCTION AND LEGAL STANDARD**

The question before the Court is whether TD Sports is liable to Plaintiffs for the withdrawal liability of FTC based on a theory of successor liability.  The Ninth Circuit instructs that "the primary question in labor and employment successorship cases is whether, under the totality of the circumstances, there is substantial continuity between the old and new enterprise." *Resilient Floor Covering Pension Trust Fund Board of Trustees vs. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1090 (9th Cir. 2018) ("*Michael's Floor Covering*") (cleaned up).  A court assessing whether the new business is the successor of an old business considers the following factors, which are not exhaustive:

> Whether there has been a substantial continuity of the same business operations; whether the new employer uses the same plant; whether the same or substantially the same work force is employed; whether the same jobs exist under the same working conditions; whether the same supervisors are employed; whether the same machinery, equipment, and methods of production are used; and whether the same product is manufactured or the same service is offered.

*Id.* at 1090-91 (cleaned up).

In this context, the Ninth Circuit has held that whether the "successor deliberately takes over 'basically the same body of customers'" "is of special significance when determining successorship for purposes of withdrawal liability under the MPPAA construction industry exception." *Id.* at 1095.  This is because under that exception, "an employer's complete withdrawal and cessation of work usually does not harm the plan because other contributing employers will pick up the construction jobs (i.e. the customers) that would have gone to the withdrawing company." *Id.*  But "if, instead, an employer uses its insider knowledge to draw a great many of the predecessor's customers, and so can pick up where the predecessor left off, doing the same type of work as the predecessor, yet neither contributes to the pension plan nor pays withdrawal liability, the assumption that animates the construction industry exception collapses." *Id.* at 1095-96 (cleaned up).  For this reason, "focusing the successorship inquiry on business retention through exploitation of the predecessor's contacts, public presentation, and good will effectuates the purposes of the MPPAA construction industry withdrawal provisions."

*Id.* "Certain discrete factors, including whether the new employer uses the same plant and whether the same product is manufactured or the same service is offered are pertinent to determining whether the successor has in fact actively and successfully captured its predecessor's market share." *Id.* (cleaned up).

As the party seeking to impose successor liability, Plaintiffs bear the burden of proving by a preponderance of the evidence that TD Sports is liable as FTC's successor. *See Heavenly Hana LLC v. Hotel Union*, 14-CV-03743-JCS, 2016 WL 524327, at *9 (N.D. Cal. February 10, 2016), *rev'd on other grounds*, 891 F.3d 839 (9th Cir. 2018).

Based on the record presented at trial, the Court finds that Plaintiffs have met their burden of showing by a preponderance of the evidence that TD Sports is liable as the successor to FTC, such that Plaintiffs are entitled to judgment in their favor. The factual and legal basis for this conclusion is set out below.

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]

### A.   Background Facts

Field Turf Construction, Inc. ("FTC") was incorporated by Darrell and David Brown on or about September 16, 2005, under the name Grass Valley Turf Construction, Inc. Dkt. No. 54 ("Undisputed Facts") at § 3.h. On February 13, 2012, the Browns amended the name of the corporation to Field Turf Construction, Inc. *Id.* at § 3.i.

FTC (the alleged predecessor company) entered into collective bargaining agreements in October 2011 and September 2015 with District Council 16 of the International Union of Painters and Allied Trades ("Union"). TX 203 (2011 CBA); TX 206 (2015 CBA). On the same day as it entered into the 2011 CBA, FTC also signed two additional documents, one called a "Sacramento Area Addendum," and one called a "Synthetic Grass Addendum" that covered "only the preparation, installation and the maintenance of synthetic grass." TX 205, 204. The 2015 CBA was again accompanied by a "Sacramento Area Addendum" signed on the same date, but did not

---

[2] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

3

1   include any "Synthetic Grass Addendum." TX 206, 207 ("Sacramento Area Addendum").[3]

2   FTC contributed to the Resilient Floor Covering Pension Fund (the "Pension Fund") on
3   behalf of its employees who performed work covered under the CBA. Undisputed Facts at § 3.b.

4   In December 2015, FTC decided to go out of business and filed a Certificate of Dissolution
5   with the State of California on January 4, 2016. TX 216.

6   TD Sports (the alleged successor company) was formed in January of 2016. TX 221. TD
7   Sports never entered into a CBA with the Union. Undisputed Facts at § 3.c. TD Sports operates
8   at least 40 hours a week. *Id.* at § 3.p.

9   It appears to be undisputed that effective July 1, 2019, FTC withdrew from participation in
10  the Pension Plan. *See* TX 1 (September 27, 2021 notice of withdrawal liability).

11  On December 29, 2020, the Pension Fund sent FTC and TD Sports notification of its
12  withdrawal liability assessment of $808,615.00 and demand for payment on schedule specified by
13  the Pension Fund. Undisputed Facts at § 3.m. On or around September 27, 2021, the Pension
14  Fund mailed a second notice to FTC (c/o Darrell Brown) and TD Sports (c/o Timothy Golden) of
15  FTC's withdrawal liability assessment. *Id.* at § 3.n.; TX 1. Neither FTC nor TD Sports has made
16  any payments toward the withdrawal liability. Undisputed Facts at § 3.o.

17  **B.  Discussion**

18  The Court next considers the *Michael's Floor Covering* factors and the relevant facts with
19  respect to each.

20  //

---

[3] Plaintiffs' witness Randy Rojas testified that the Synthetic Grass Addendum signed with the first CBA continued in force under the second CBA even though it was not attached to or signed contemporaneously with that document. TT Vol. 1 38:13-39:14. The Court does not find that testimony credible, given that the parties expressly entered a second Sacramento Area Addendum but did not include a second Synthetic Grass Addendum even though they clearly knew how to do so. But the Court finds this issue immaterial, because the operative CBA covered maintenance of artificial turf within its scope. The Court finds that it would not make sense for an addendum to add an entirely new, previously uncovered subject matter area to the CBA, and credits Rojas' testimony to that effect. *See* TT Vol. 1 30:13-15 (Synthetic Grass Addendum did not add maintenance to the scope of work of the CBA); *id.* 53:8-19 (explaining that the purpose of the addendum was to cover "bread and butter" details like rates and specific working conditions for contractors preparing, installing and maintaining synthetic grass); TX 204 at 2 (detailing, for example, what happens "[i]f inclement weather forces a job to be shut down during the regular work week").

### i. There Was Substantial Continuity of the Same Business Operation Here, and TD Sports Deliberately Took Over Basically the Same Dominant Customer From FTC.

With respect to this factor, which the *Michael's Floor Covering* opinion identified as having "special significance," the Court finds that the trial evidence supported Plaintiffs' successor liability claim.

The evidence clearly established that both FTC and TD Sports got a significant portion of their business from a synthetic turf manufacturer called FieldTurf USA ("FTUSA") or one of its affiliates. *See* TT Vol. 1 99:23-100:2 (testimony by Darrell Brown, former part-owner of FTC, acknowledging that when FTC was dissolved in late 2015, almost a hundred percent of its work came from FTUSA); TT Vol. 2 287:7-288:12 (testimony by Tim Golden, CEO of TD Sports, acknowledging that "the vast majority" of $2 million in sales in 2018 and 2019 came from jobs originating with FTUSA or affiliated companies). The evidence also clearly established that FTC and TD Sports were never in the same primary line of business: FTC's main business was synthetic field installation, and it did not itself perform any stand-alone field maintenance, and TD Sports' business is synthetic field maintenance, and it does not do field installation:

- Ryan Sterrett, a former employee of FTC, testified that FTC's main business was installing or replacing turf fields, and that he was unaware of any maintenance work (though he believed the company did some work on previously installed fields that were under warranty to remedy installation issues). TT Vol. 2 199:12-18; 209:9-210:17.
- Tim Golden, the CEO of TD Sports, confirmed that in the several thousand jobs TD Sports has handled since its inception in 2016, it has never performed installation of synthetic turf fields, and that its primary business is "maintenance, minor repairs, earthwork, site furnishings [like goal posts and soccer nets]." TT Vol. 2 246:18-247:4; 270:11-272:22.
- Robert Gloeckner, FTUSA's 30(b)(6) witness and currently Vice-President for the Western Region of one of FTUSA's divisions, testified that FTUSA's business is manufacturing and installing synthetic turf, and that Grass Valley Turf

5

Construction (FTC's predecessor) did synthetic turf installation for FTUSA. Gloeckner testified that TD Sports, by contrast, did field cleaning and maintenance as well as "smaller prep work" and "base work" like removing sod and raising electrical boxes. (Gloeckner Depo Transcript) at 8:10-9:14; 18:12-22; 20:10-17.[4]

But the evidence also clearly established that FTC agreed to find coverage for maintenance work for FTUSA customers in Northern California for a period of time starting in 2013 to replace the prior provider of those services, and had actual billing responsibility for those services. TT Vol. 2 322:2-326:15; 234:17-235:3. Darrell Brown testified that someone at FTUSA, perhaps "Tiffany," contacted him before FTC dissolved about the possibility of FTC "taking on maintenance in . . . California, because the person who had done it had left abruptly." *Id.* 322:2-6; TT Vol. 3 47:17-48:8. Brown "grudgingly agreed," while letting FTUSA "know in no uncertain terms that we did not have a desire or time within our existing schedule to take something on like that permanently." TT Vol. 2 322:14-18. Brown understood that this arrangement would be needed until FTUSA found a replacement. *Id.* 322:19-23.[5]

Even though he "had no idea" whether Tim Golden was capable of doing the work FTUSA had asked him about, Brown asked Golden whether he would be interested, and when Golden said he was, Brown put him in touch with FTUSA. *Id.* 323:3-324:8. Golden's prior company, called "Cleaner Greener," used maintenance equipment he leased from FTUSA once it started doing this work. TT Vol. 2 236:9-237:10; 294:24-295:9. Golden worked primarily with FTUSA personnel in this role. *Id.* 238:21-239:2. Golden reported his maintenance work to FTC, which in turn invoiced FTUSA, then once FTUSA paid FTC, it forwarded the payments received back to

---

[4] The parties agreed to admit the deposition transcript in lieu of live testimony from Mr. Gloeckner. TT Vol. 2 169:18-170:14.

[5] Neither party introduced any written agreement between FTC and FTUSA with respect to maintenance work, so the Court assumes this arrangement was based on an oral agreement. The introduction of other written agreements suggests to the Court that if the FTC-FTUSA maintenance arrangement was in writing, it would have been offered in evidence. *See* TX 211 (June 8, 2020 "Maintenance Agreement" between TD Sports and FTUSA); TX 6 (January 1, 2013 "Field Turf Installation Agreement" between FTUSA and FTC regarding provision of "installation services . . . with respect to contracts entered into by FieldTurf to supply and install artificial turf").

6

Cleaner Greener. *Id.* 239:12-17; TT Vol. 3 49:20-51:12.[6]  FTC was compensated for the time and effort that these bookkeeping efforts required.  TT Vol. 3 51:17-19.

In 2016, Golden transitioned his business from Cleaner Greener to TD Sports to create an LLC and protect himself from liability via this corporate structure.  TT Vol. 2 240:1-20; TX 221 (articles of organization); TX 260 (operating agreement).  At the time of this transition from Cleaner Greener to TD Sports, there was not any real change in the company's operation, which continued to be "a lot of maintenance."  TT Vol. 2 241:21-242:8.  After TD Sports was created, it billed FTUSA directly, in contrast to the Cleaner Greener period during which Golden recalled that he "only billed [FTC]."  *Id.* 297:12-25.

The critical import of these essentially undisputed facts is that: (1) FTC "reluctantly" agreed with FTUSA to "take on maintenance" of synthetic turf in California; (2) FTC referred this work to Golden, then invoiced FTUSA for these services in amounts directed by Golden based on the work done; and then (3) FTC paid Cleaner Greener (which later became TD Sports) the money paid by FTUSA in response to the FTC invoices as a pass-through.  Without question, as a turf installation company, FTC could have declined to get in the middle between FTUSA and Cleaner Greener/TD Sports with respect to turf maintenance in the way it did.  But it chose to do so, becoming the actual party billing and being paid for the maintenance work by virtue of its arrangement with FTUSA, then handing off all aspects of this work formally to Cleaner Greener/TD Sports once FTC closed down.  Under these circumstances, TD Sports "basically took over" FTC's customer base after FTC stopped operating, and this most important factor weighs strongly in favor of a finding of successor liability.  *See Michael's Floor Covering*, 801 F.3d at 1095–96 (explaining that where "an employer uses its insider knowledge to draw a great many of the predecessor's customers, and so can pick up where the predecessor left off, doing the same type of work as the predecessor, yet neither contributes to the pension plan nor pays withdrawal

---

[6] Neither party introduced any invoices reflecting this arrangement, but Defendants were essentially consistent in describing how they executed it.  Golden recalled that he invoiced FTC for his maintenance work.  TT Vol. 2 239:12-17; TT Vol. 3 300:1-2 ("Field Turf Construction was just like an invoicing tool for me.").  For his part, Brown remembered that Golden would "tell [FTC's] bookkeeper" about the work done, and the bookkeeper then prepared the invoice to send to FTUSA.  TT Vol 3 50:2-51:19.

liability, the assumption that animates the construction industry exception collapses") (cleaned up).  In sum, FTC was "doing" maintenance work by billing FTUSA directly for that work in its own name, and being paid for it, even though Cleaner Greener/TD Sports actually executed the work.[7]  This constituted "substantial continuity of the same business operations" under *Michael's Floor Covering*.

          **ii.**     **Use of the Same Plant/ Use of the Same Machinery, Equipment, and Methods of Production**

The evidence clearly and credibly established that TD Sports was not based in the same location or facility where FTC had been, and that TD Sports did not purchase or take over any of FTC's equipment (which makes sense, given the very different equipment required to install fields as opposed to maintaining them).  TT Vol. 2 245:23-246:17 (Golden testimony that TD Sports did not buy any equipment from FTC, did not use facilities previously owned, rented or leased by FTC, and did not acquire any kind of physical property or real estate rights from FTC); TT Vol. 1 145:12-15 (testimony by David Brown that he was personally involved in the sale of all of FTC's assets, and none of FTC's equipment was sold to TD Sports).  This evidence weighs against a finding of successor liability.

//

//

---

[7] Defendant accurately pointed out that in the complaint and during discovery in the case, Plaintiffs did not contend that their successor liability argument was based on FTC having performed maintenance work.  TX 219 at 17:2-5 (as part of response to interrogatory directing Plaintiffs to "[s]tate all facts which support your contention that TD Sports is a substantial continuation of Field Turf," representing that "Field Turf performed synthetic installation for FTUSA, Inc.," and contending that "TD Sports Group, LLC performs synthetic turf installation and repair and maintenance of synthetic turf installation").  And while Plaintiffs' witness Randy Rojas testified in a conclusory way that FTC "installed, repaired, [and did] maintenance" while covered by the CBA, TT Vol. 1 24:20-25:4, he acknowledged that there was no documentation showing dues payments for maintenance work, and was unaware of any dispatch reports reflecting such work.  *Id.* 46:6-11; 49:8-10.  Similarly, in its proposed findings of fact and conclusions of law, Plaintiffs assert that "TD's business included the maintenance, repair and installation of synthetic grass."  Dkt. No. 89 at 5.  But the purported support for that assertion (with no pin cite) is "Trial Exhibit 212," which is just a 91-page spreadsheet listing hundreds of jobs in one-line synopses.  In the end, though, none of this matters, because whether or not FTC itself actually *performed* maintenance work for FTUSA customers, it made the decision to enter an agreement with FTUSA under which it was responsible for billing for such services and getting paid for them.  Then it passed that role on to Cleaner Greener/TD Sports directly after shutting its doors.

### iii. Employment of Same Workforce and Supervisors

The evidence clearly established that TD Sports does not employ the same or substantially the same workforce as FTC. Over the course of TD Sports' existence through the time of trial, it has employed between 30 to 40 people. TT Vol. 2 263:11-14. Of these, TD Sports hired three employees from FTC: Eric Bachman, Kevin Couch and Mr. Couch's nephew Bryce. *Id.* 251:14-21; 263:15-18. Bachman worked for TD Sports for about six months. Kevin Couch worked there for about four or five years, and his nephew Bryce worked there for about two and a half years. *Id.* 263:19-264:2. After FTC dissolved at the end of 2105, around 16 of its then-32 employees went to work for FTUSA doing synthetic turf installation work, which required them to maintain their Union membership. TT Vol. 3 9:19-11:9; TX 214.

On the other hand, Darrell Brown clearly has been substantially involved in both companies. At the time FTC dissolved, it had two members: Darrell Brown and David Brown. TT Vol. 2 307:20-24; *see also* TX 216 (Certificate of Dissolution reflecting signatures of Darrell Brown and David Brown, with a third line for "Signature of Director" blank). Darrell Brown was a fifty percent owner, and his brother owned the other fifty percent. TT Vol. 1 69:12-17. The record reflects, without room for genuine dispute, that Darrell Brown then became a manager or member of TD Sports in January 2020 at the latest. TX 271 (January 28, 2020 Statement of Information for TD Sports submitted to the California Secretary of State listing Brown as an "Additional Manager or Member"); *see also* TX 235 at Bates numbers 189 ("TD Sports Group 2020 Organizational Chart" attached to a September 2020 proposal listing Golden (CEO) and Darrell Brown (CFO) under the heading "Owners/Founders"), 175 (September 4, 2020 quotation by TD Sports Group, LLC for turf and facilities maintenance services signed by Darrell Brown as "Owner/Partner").[8] At the time of trial, Brown was CFO and a fifty percent owner of TD Sports. TT Vol. 1 69:2-11.

One of the key disputed issues at trial was how early Darrell Brown became involved with

---

[8] Brown testified that he did not become a "full-time employee" of TD Sports until 2021, and that he became a part time employee in 2020, which was inconsistent with his deposition testimony. TT Vol. 1 88:8-89:6.

TD Sports, and the evidence convincingly supports Plaintiffs' position that he had a substantial role well before 2020. As early as Spring 2016, and continuing on through the early months of its existence and beyond, Brown used a TD email address (darrell@tdsportsgroup.net). *See* TX 36, 34, 35. Brown could not credibly explain why he had this email address years before he supposedly worked for TD Sports. TT Vol. 1 93:5-95:22 (Brown testified that he didn't remember how he became aware that he had a tdsportsgroup.net email address, speculated that "somebody assigned that to me, evidently, within the company," said he was only using the email address for "personal things" rather than TD Sports' business, and contended that because his job at the time with FTUSA involved overseeing and managing the region, he assumed "they probably wanted me to have some sort of awareness as to what was going on in the region with regards to TD Sports' work").

On April 25, 2016, less than four months after TD Sports was founded, Brown submitted a proposal for work on behalf of the company which he signed as its "Program Manager." TX 233 at Bates 156.[9]

On October 9, 2017, Brown signed an "Application for Original Contractors License" and identified himself under penalty of perjury as TD's Responsible Managing Employee. TX 10. Brown testified that he "filled that out incorrectly." TT Vol. 3 36:23-37:2.

On June 3, 2019, Brown signed an "Application for Additional Classification" with the California State Contractors License Board in which he declared under penalty of perjury that he was an "owner, general partner, current officer, manager, or member" of TD Sports. TX 40. On the same form, Darrell's brother David signed under penalty of perjury that he was a "Responsible Managing Manager" of TD Sports. *Id.*

And on September 4, 2020 (prior to 2021, when Brown testified at trial that he became a TD Sports employee), TD Sports submitted a Proposal to the City of Laguna Miguel for "Synthetic Sports Turf and Facilities Maintenance Services." TX 235. The form indicates that

---

[9] With respect to this document, Brown "guesstimate[d]" that because his signature was electronic, "one of the admin people at TD Sports used it." TT Vol. 3 33:16-34:14. The Court finds this effort to disavow the representations in the document not to be credible.

10

"By submitting this response, the Proposer warrants and represents to the City" a number of things, including "Signed statement attesting that all information submitted with the proposal is true and correct." *Id.* at Bates 170.  Brown signed this document in various places as a "member of the partnership or joint venture" and as an "owner/partner." *Id.* at Bates 171, 175.[10]  The proposal said that TD Sports was founded in June 2006 and listed the length of time in business as 14 years. *Id.* at Bates 177.  June 2006 was approximately a decade before the undisputed 2016 incorporation date of TD Sports, but roughly matched the 2006 founding date of Grass Valley Turf Corporation, the predecessor to FTC.  TT Vol. 1 55:17-56:21.  On the line directing the applicant to "provide the parent company if applicable," the form listed "Grass Valley Turf Company, Inc."  TX 235 at Bates 177.[11]

All of this evidence establishes that Darrell Brown was substantially involved with TD Sports not long after FTC dissolved and handed over direct responsibility for billing FTUSA for maintenance work.  It also establishes that TD Sports held itself out as essentially a successor to Grass Valley Turf Company and then FTC, given the representations about time in business and parentage.  Overall, this factor thus weighs in favor of a finding of successor liability.

      **iv.** **Existence of Same Jobs and Working Conditions**

Setting aside FTC's involvement in billing FTUSA for maintenance work as described above, the evidence regarding the actual work performed by the two companies showed that FTC employees did a fundamentally different job (turf installation) than TD Sports employees (turf maintenance).  Installation involves a crew of six to eight workers pulling heavy large rolls of synthetic turf and using sewing machines to sew together panels of turf over a period of days or

---

[10] In response to Plaintiffs' counsel's question "Mr. Brown, are you saying that because— assuming that the signatures on Exhibit 235 are electronic, that you are somehow not responsible for the contents of this document?," Brown answered "yes." TT Vol. 1 118:18-22.  The Court again finds this disavowal not to be credible.

[11] When asked by Plaintiffs' counsel "So are you saying it's not true, what you put in here?," Brown responded "I'm saying it might be exaggerated," and elaborated that "as is the case with job applications, sometimes you fill it out to better qualify, so obviously in this case, that's what I did."  The Court again finds the contemporaneous representations, made before Brown had a motive to change his story based on the claims in this lawsuit, more credible than his current disavowal.

11

weeks. Maintenance involves using a small tractor and other hand tools like blowers for a day at a time to brush and otherwise maintain the field, as well as some minor turf repairs like regluing the corner of a hashmark. TT Vol. 2 236:9-237:6; 249:24-251:3; 280:22-282:12; 307:25-311:14. This evidence weighs against a finding of successor liability.

### v. Conclusions of Law

#### a. TD Sports is Liable as FTC's Successor.

Under the *Michael's Flooring* factors, Plaintiffs have established by a preponderance of the evidence that TD Sports is liable as the successor of FTC. The most significant factor, substantial continuity, strongly weighs in favor of a finding of successor liability, and Darrell Brown's substantial involvement in TD Sports starting shortly after FTC dissolved also weighs in favor of that finding.

The Court further finds that TD Sports had constructive notice of the withdrawal liability. A successor can be liable for its predecessor's MPPAA withdrawal liability "so long as the successor had notice of the liability." *Michael's Floor Covering*, 801 F.3d at 1095. In *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, the Ninth Circuit held that "constructive notice of withdrawal liability is sufficient to trigger successor withdrawal liability under the MPPAA." 891 F.3d 839, 847 (9th Cir. 2018). *See Resilient Floor Covering Pension Tr. Fund Bd. of Trustees v. Michael's Floor Covering, Inc.* (*Michael's Floor Covering II*), No. 11-CV-05200-JSC, 2016 WL 5407848, at *5 (N.D. Cal. Sept. 28, 2016), *aff'd*, 707 F. App'x 859 (9th Cir. 2017) ("Notice can be proven not only by pointing to the facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances.") (internal citation and quotations omitted). The purpose of the notice requirement is "to ensure fairness by guaranteeing that a successor had an opportunity to protect against liability." *Steinbach v. Hubbard*, 51 F.3d 843, 847 (9th Cir. 1995).

The circumstances of this case present a somewhat novel application of the constructive notice inquiry in the MPPAA withdrawal liability context. *Heavenly Hana* involved a direct purchase of a predecessor by a successor, and held that a successor-purchaser has constructive notice of the predecessor's withdrawal liability if the purchaser would have discovered the liability

12

using reasonable care or due diligence. *Heavenly Hana*, 891 F.3d at 847. Further, in *Michael's Floor Covering*, the Ninth Circuit held that successor liability may also be imposed "even where the successor did not purchase or merge with the predecessor" when the successor is "well aware of its predecessor's liability [and] is able to consider that information before deciding to continue the predecessor's business." *See Michael's Floor Covering*, 801 F.3d at 1093 (cleaned up).

Here, the member of the successor company who was or should have been "well aware" of FTC's withdrawal liability was Darrell Brown. As an owner of FTC, Brown had signed a CBA with his unionized workforce agreeing to contribute to the Pension Fund for covered employees on January 1 of each year of the CBA term, which ended June 30, 2019. *See* TX 206 at 1, 20. The CBA also included language stating that the Pension Fund had been in "critical status" since January 2010. *Id.* at 21. Contributing to an underfunded union pension fund as an employer reasonably "should have alerted [Brown] to the possibility of withdrawal liability." *See Bd. of Trustees of Auto. Mechanics' Loc. No. 701 Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 997 (7th Cir. 2016); *Heavenly Hana*, 891 F.3d at 847 (purchaser's actual knowledge of unionized workforce and status of pension plan as underfunded established purchaser's constructive notice of withdrawal liability). *Cf. Michael's Floor Covering II*, 2016 WL 5407848, at *6 (holding that the owner of an alleged successor company's status as former employee of the predecessor company was not sufficient to put him on constructive notice of the predecessor's withdrawal liability because he was a non-union salesperson at the predecessor, "not an executive who dealt with the union on [the predecessor's] behalf.").

But at the same time, the evidence at trial did not establish Brown's role in TD Sports' initial decision to take over FTC's maintenance operations. As discussed above, the evidence showed that Brown was substantially involved with TD Sports soon after that point, but his involvement prior to that was less clear. Accordingly, at trial, TD Sports argued that the notice requirement was not satisfied because Tim Golden, the CEO of TD Sports, allegedly had no knowledge of the withdrawal liability until 2021, and Brown was not brought on board at the company until 2020 (which was well after the operations were transferred from FTC in 2016). Similarly, when TD Sports submitted its request for review of the withdrawal liability

13

determination to the Pension Fund, the company argued that to establish successor liability, "the plaintiff must prove that the successor had notice of the predecessor's withdrawal liability *prior to* the transfer of the business," citing *Michael's Floor Covering*. *See* TX 269 at 2 (emphasis added).

The Court disagrees with the suggestion that *Michael's Floor Covering* precludes a finding of constructive notice here because the record did not show that TD Sports had notice of FTC's potential withdrawal liability prior to the initial transfer of FTC's business. To be clear, the Ninth Circuit did not explicitly hold that a successor must have notice "prior to the transfer of the business." More accurately, the Court held that the notice requirement may be satisfied if a successor "is able to consider" information about the liability "before deciding to continue the predecessor's business." *Michael's Floor Covering*, 801 F.3d at 1093. And importantly, *Michael's Floor Covering* did not address the circumstances here, where the Court can conclude that the successor had constructive notice of the liability soon after the initial transfer of the business. Darrell Brown was substantially involved with TD Sports soon after it took over FTC's maintenance operations in 2016. As early as 2017, he was identifying himself as a "Responsible Managing Employee" of TD Sports in official documents submitted to state regulators. On these facts, it is reasonable to impute Brown's constructive notice of the withdrawal liability to TD Sports at the time Brown was involved in a significant role in the company, starting in 2016. The question that *Michael's Floor Covering* and other cases have not answered is whether such notice is sufficient to impose successor liability on TD Sports.

The Court holds that it is. As the Ninth Circuit reiterated in *Michael's Floor Covering*, "fairness is a prime consideration in [the] application" of successor liability. *Michael's Floor Covering*, 801 F.3d at 1091 (internal citation and quotation omitted). The notice requirement ensures fairness by "guaranteeing that a successor had an opportunity to protect against liability." *Steinbach*, 51 F.3d at 847. Here, Brown was working at TD Sports in a management role several years before FTC's withdrawal liability was officially incurred in June 2019 when the CBA expired and FTC's contribution obligation ended. *See* TX 4 at § 3(b) (withdrawal occurs when employer ceases to have obligation to contribute to the Pension Fund). He thus had ample time to enable TD Sports to protect itself against FTC's withdrawal liability before it was incurred and the

14

1   Pension Fund sought to collect it. Under these circumstances, the Court finds that it is fair to

2   impose successor liability on TD Sports to ensure that the company's informal continuation of

3   FTC's business "will not shield it from successorship liability," where TD Sports (through Brown)

4   had sufficient notice to anticipate FTC's withdrawal liability and could have taken preventative

5   action before it was imposed. *See Michael's Floor Covering*, 801 F.3d at 1093; *see also Golden

6   State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 185 (1973) (holding that "the successor must have

7   notice before liability can be imposed").

### b.  Judgment is Appropriately Entered Now Against TD Sports.

Having found that TD Sports is the successor to FTC, the Court must next decide whether to simply enter judgment against TD Sports in the amount of $808,615.00 (the amount identified in Plaintiffs' 2020 withdrawal liability assessment), plus penalties, interest and attorneys' fees, or refer the case to arbitration for a determination of the amount of its liability. *Compare* Dkt. No. 89 at 15-20 (Plaintiffs' argument) *with* Dkt. No. 65 (Defendant's argument). There is no Ninth Circuit authority cited by either party that is on all fours with the facts of this case. But the Court finds that the substantial weight of persuasive authority establishes that Defendant waived its right to contest the amount of liability in arbitration by failing to act within the 60-day timeframe set out in the statute.

A pension plan seeking withdrawal liability payment is required under the MPAA (29 U.S.C. section 1399(b)(1)) to send to the employer from whom it is seeking those payments, a notification of assessed withdrawal liability and demand for payment pursuant to the payment plan described in it. The employer may then seek review. If the matter is not resolved after the notice described above, under 29 U.S.C. section 1401(a)(1), either party may initiate arbitration within sixty days after the earlier of the date of either (1) the Pension Fund's notification to the employer of its review and assessment of the withdrawal liability or (2) 120 days after the date the employers' request for review of its' withdrawal liability assessment.

The MPPAA statutory scheme has been characterized as a "pay first-question later" system, which means that not only must there be a timely initiation of arbitration, but also that even if arbitration is initiated, it must be followed by payment of the liability in accordance

with the Fund's demand while the arbitration is decided.  *See ILGWU National Retirement Fund v. Levy Bros. Frocks, Inc. (Levy Bros.)*, 846 F.2d 879, 882 (2d. Cir. 1988); *Bowers v. Transportation Maritima Mexicana, S.A.*, 901 F.2d 258, 263 (2d Cir. 1990).  Failure to initiate arbitration within the statutory period results in liability as calculated by the pension fund.  *Teamsters Pension Trust Fund v. Allyn Transp. Co.*, 832 F.2d 502 (9th Cir. 1987).

Whether a company in a withdrawal liability case is an "employer" within the meaning of the MPPAA "is properly for the courts, not an arbitrator to determine." *Bowers*, 901 F.2d at 261; *see also Unite Here Ret. Fund v. City of San Jose*, No. 5:20-cv-06069-EJD, 2021 WL 292533, at *6 (N.D. Cal. January 28, 2021).  But the putative employer is "obligated to arbitrate the issues of notice and amount of liability." 29 U.S.C. § 1401(a)(1); *Bowers*, 901 F.2d at 262.  An employer must commence making the demanded payments within 60 days of initiating arbitration under ERISA's "pay-first-question-later" system.  *Id.*  Failure to initiate arbitration in a timely manner and make the payments required results in a default, meaning that the entire amount of the withdrawal liability is due.  *See id.* (agreeing that where the putative employer "did not seek review and arbitration within 90 days of receipt of the complaint," "a default has occurred").  The *Bowers* court explained that the employer's "failure to pay or to preserve its right to arbitration has resulted in a default," and that while that might "seem a harsh result, . . . the harshness of the default is a largely self-inflicted wound." *Id.* at 264.

As reflected in a number of cases, it is not uncommon for a defendant to contest its employer status and seek a judicial determination on that issue while also seeking to raise defenses to its withdrawal liability in arbitration.  A defendant in this situation has at least three choices: (1) it can timely initiate arbitration, pay the interim withdrawal liability payments, and then receive a refund and interest if it prevails in its defenses; (2) it can bring an action for declaratory judgment and request that the period to initiate arbitration be tolled; or (3) it can request that the pension fund agree to voluntarily toll the period for initiating arbitration, which is expressly permitted under the governing regulations (29 C.F.R. § 4221.3(b)).

But what it cannot do is what TD Sports has done here:  fail to timely initiate arbitration and then wait until the eve of trial to raise the issue for the first time.  All federal appellate courts to

16

1  consider this issue have held that an alleged employer must initiate arbitration or bring a
2  declaratory judgment action to toll the arbitration period, and several district courts (including
3  some in the Ninth Circuit) have done the same. *See Levy Bros.*, 846 F.2d at 887 ("If a party wishes
4  to seek judicial resolution of its dispute without first submitting to arbitration it should seek
5  declaratory and/or injunctive relief against the imposition of withdrawal liability before the time
6  period to initiate arbitration expires. The failure to seek such relief on a timely basis may, in some
7  instances, lead to a harsh result, but the harshness of the default is largely a self-inflicted wound.")
8  (internal quotation marks omitted); *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*
9  *(Barker)*, 788 F.2d 118 (3d Cir. 1986) (defendant who challenged its status as a member of the
10 employer's controlled group was required to bring a declaratory judgment action to toll period of
11 initiating arbitration or initiate arbitration); *Banner Industries, Inc. v. Central States, Southeast &*
12 *Southwest Areas Pension Fund*, 875 F.2d 1285 (7th Cir. 1989) (affirming district court's holding
13 that employer preserved right to arbitrate by bringing litigation within the period to arbitrate, but
14 noting that it was not "a case in which the party assessed did absolutely nothing, waited until the
15 pension filed a collection against it, and then for the first time tried to assert its defenses in court
16 when it should have proceeded in arbitration."); *GCIU-Employer Ret. Fund v. Progress Printing*
17 *Co.*, No. CV 20-4891-DMG (RAOx), 2021 WL 4893355 (C.D. Cal. Sep. 21, 2021), at *4 (citing
18 the Third Circuit's holding in *Barker* for the proposition that an alleged controlled group member
19 must initiate arbitration or file a declaratory judgment action or waive the defenses it could have
20 brought in arbitration); *Bd. of Trs. v. ILA Local 1740, AFL-CIO*, No. 18-1598 (SCC), 2022 WL
21 2117771, at *14 (D. Puerto Rico June 13, 2022) (citing *Barker* and *Levy Bros.* in holding that "an
22 entity that argues that it is not an employer because it has never been obligated to contribute to a
23 fund must do something to preserve review and arbitration if it also wishes to contest the
24 withdrawal liability amount") (internal quotation marks omitted); *I.A.M. Nat'l Pension Fund v.*
25 *TMR Realty Co*, 431 F. Supp. 2d 1, 16 (D.D.C. 2006) ("While courts have allowed parties to
26 escape arbitration in certain cases and proceed directly to judicial resolution of withdrawal
27 liability, such circumvention is only proper if the party should seek declaratory and/or injunctive
28 relief against the imposition of withdrawal liability before the time period to initiate arbitration

expires.") (citing *Barker* and *Levy Bros.*); *Einhorn v. J&S, Inc.*, 577 F. Supp. 2d 752, 762 (D.N.J. 2008) (citing *Barker* in holding that a defendant challenging its status as employer must still either initiate arbitration or file a declaratory judgment action to toll the period to initiate arbitration).

By contrast, Defendant has not cited any authority supporting its argument that now that it has been found to be a successor employer, the Court must refer this matter to arbitration regarding its challenges to the amount of liability claimed. TD Sports essentially contends that disputing its status as an employer relieved it of the obligation to initiate arbitration by the statutory deadline. Consistent with all of the authority cited above, the Court disagrees. If TD Sports thought it had a basis for not being required to timely initiate arbitration, it should have brought an action for declaratory relief, and/or asked the Court to enjoin the statutory period for requesting review and initiating arbitration. *See GCIU-Employer Ret. Fund*, 2021 WL 4893355, at *4; *Bowers*, 901 F.2d at 264; *Barker*, 788 F.2d at 129. It did neither of these things, instead waiting until less than one month before trial to even raise this issue. The Court finds that this course of action constituted a waiver.[12]

Having found that TD Sports is a successor employer, and that arbitration is not authorized at this stage, the Court last addresses the issue of damages. The Pension Fund sent TD Sports a notice of withdrawal liability on September 27, 2021, which TD Sports received. Undisputed Facts at § 3.n; TT Vol. 3 26:15-19. TD Sports requested review of the above notice by letter dated November 23, 2021. TX 269. The company has admitted that it has made no withdrawal liability payments as required under the assessment. Undisputed Facts at § 3.o. It admitted that it did not initiate arbitration after receiving the Fund's withdrawal liability notice. *See* Dkt. No. 36 (Answer to Amended Complaint) ¶ 29. TD Sports also did not file a cross claim for declaratory relief regarding the arbitration, and never sought relief from the Court to enjoin the payment of the

---

[12] The Court finds that *New York Teamsters Conf. Pension & Ret. Fund ex rel. Bulgaro v. Doren Ave. Associates, Inc.*, 321 F. Supp. 2d 435 (N.D.N.Y. 2004), on which TD Sports relies, is in key respects consistent with the weight of authority discussed above. *See* 321 F. Supp. 2d at 443 (noting that defendants' counsel "failed to advise their clients, once in receipt of the withdrawal liability notices from the Fund sponsor, to initiate a declaratory judgment action, the procedural path explicitly and consistently identified by the case law for companies in their position," citing *Levy Bros.*, *Banner* and *Barker*, among other cases). And to the extent this case arguably is inconsistent in some other way with that weight of authority, the Court finds it unpersuasive.

18

withdrawal liability or postpone the arbitration. Plaintiffs are thus entitled to entry of judgment in their favor.

### III. CONCLUSION

The Court finds that Defendant TD Sports, LLC, is liable for the withdrawal liability as calculated by the Pension Fund, along with penalties, interest and attorneys' fees pursuant to statute. Plaintiffs are directed to submit a simple proposed form of judgment of two pages or less by February 11, 2025. The judgment need not, and must not, repeat any of the substantive analysis in these findings of fact and conclusions of law.

**IT IS SO ORDERED.**

Dated: 2/6/2025

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

19